**UNITED STATES of America,**

v.

**Darryl GREEN, et al. Defendants.**

**No. CRIM.02–10301–NG.**

United States District Court,
D. Massachusetts.

Nov. 3, 2004.

As Amended Nov. 4, 2004.

William C. Brennan, Jr., Brennan, Trainor, Billman & Bennett, LLP, Upper Marlboro, MD, Randolph M. Gioia, Law Office Of Randolph Gioia, Boston, MA, Sarah Jennings Hunt, Cambridge, MA, Jeffrey B. O'Toole, Washington, DC, for Darryl Green, Defendant.

Christie M. Charles, George F. Gormley, P.C., Boston, MA, for Jonathan Hart, Defendant.

John H. Cunha, Jr., Cunha & Holcomb, PC, Boston, for Edward Washington, Defendant.

Patricia Garin, Max D. Stern, Stern, Shapiro, Weissberg & Garin, Boston, MA, David P. Hoose, Katz, Sasson, Hoose & Turnbull, Springfield, MA, David J. Huss, Rapid City, SD, Melvin Norris, Mel Norris, Wayland, MA, for Branden Morris, Defendant.

Theodore B. Heinrich, United States Attorney's Office, Boston, MA, for USA, Plaintiff.

Wayne R Murphy, Murphy & Flaherty, Boston, for Torrance Green, Defendant.

Pretrial Services, U.S. Pretrial Services, Boston.

### MEMORANDUM AND ORDER RE: BIFURCATION

GERTNER, District Judge.

On July 7, 2004, I issued a Memorandum and Order Re: Severance/Bifurcation of Guilt and Punishment. *See United States v. Green*, 324 F.Supp.2d 311 (D.Mass. 2004). I noted that it was an open question as to whether the Court, sitting on a federal death penalty-eligible case (under 18 U.S.C. §§ 3591–3593), was obliged to impanel a single jury charged with determining both guilt and, if necessary, punishment, and death-qualify that group before either proceeding began. I proposed two methods to address the question, and called for additional briefing:

*Method One* involves impaneling a jury to hear the guilt phase in the usual way, without death-qualification, then picking the maximum number of alternates by law (already justified by the length of the trials even with two defendants). Should there be a conviction on Count Sixteen, the Court would then death-qualify the jurors from the first trial, including the alternates, to determine who is qualified to participate in the second trial. If there are not enough jurors to so qualify either Darryl Green in the first trial or Morris in the second, the Court would then discharge the guilt jury and impanel a new jury to hear punishment issues.

*Method Two* involves an order at the outset that for various case management reasons, the Court will impanel a different punishment jury if there is a conviction.

*Green*, 324 F.Supp.2d at 331.

Both sides have now fully briefed the issue. As described below, the defendants have rejected Method One and have argued for adopting Method Two. The government opposes both methods.

After reviewing the materials and relevant case law, I conclude the following: I will impanel two different juries, if necessary, for each death-eligible defendant, one jury to determine guilt or innocence and the other to reject or to impose the death penalty. I will death-qualify the punishment jury only, should a penalty proceeding become necessary. As described more fully below, my reasons are as follows:

1. 18 U.S.C. § 3593 does not require two hearings before a single jury (described as a "unitary jury system"). This provision simply codified death-eligible defendants' constitutional right to a bifurcated hearing (on guilt/innocence and punishment), whether before a single jury (following a guilty verdict) or before a second jury. In any event, to the extent that § 3593 can be read to require a unitary jury, defendants waive that requirement.

2. I will accept the defendants' waiver of a unitary jury for both prudential reasons, as well as for reasons of fairness. As I noted in my memorandum

on severance, *see Green,* 324 F.Supp.2d at 329, and as I describe more fully below, death-qualification, particularly in this Commonwealth at this time, will needlessly extend an already complicated jury selection process. And the effort will be completely unnecessary if the defendants are not convicted of the death-eligible offense.

3. While the Supreme Court has held that death-qualifying a unitary jury is not unconstitutional, neither has it held that the Constitution *requires* it. Put simply; just because death-qualifying the liability jury that may also hear the penalty phase does not offend a *defendant's* rights, does not mean its opposite: That the failure to death-qualify the liability jury (while death-qualifying the punishment jury) somehow undermines the *government's* rights.

4. Indeed, the government has no entitlement to a death-qualified *guilt/innocence* jury, or for that matter, to a unitary jury hearing both phases. It only has a right to death-qualify the jury that will determine *punishment. See Witherspoon v. Illinois,* 391 U.S. 510, 520, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

5. The government's important concerns about the impartiality of the liability jury can be adequately addressed through voir dire, which, while not nearly as extensive as a voir dire that includes "death-qualification," will nevertheless be probing and exhaustive.

6. The government's important concerns about witnesses testifying in multiple proceedings can likewise be addressed by the Court. First, it is premature to assume that there will be a punishment phase, and thus, multiple proceedings for each defendant. Second, if there is a punishment phase, there are evidentiary techniques to relieve witnesses from having to appear a second time, techniques like videoconferencing, use of transcripts, stipulations, etc.

In choosing the two juries approach, I do not have to reach the constitutional question raised by defendants whether recent studies establish that death-qualifying the liability jury skews the decision-making process of the jury by making it more conviction prone and less representative. I make my decision based upon the defendants' waiver of rights under § 3593, concerns about trial length and complexity, and the unique problems of selecting a death-qualified jury in Massachusetts given its demographics and attitudes.

## I. *BACKGROUND*

Count Sixteen of the superceding indictment in the above entitled case alleges that Branden Morris ("Morris") and Darryl Green [1] killed Terrell Gethers ("Gethers") "for the purpose of maintaining and increasing position in the Enterprise, which was an Enterprise engaged in racketeering activity." *See* Superseding Indictment, filed September 17, 2003, p. 32. The government alleges that the "Racketeering Enterprise" element was met by the activities of the "Esmond Street Posse" (hereinafter "Esmond Street"). Esmond Street, it claims, was an enterprise whose goal was to engage in the sale of crack cocaine and marijuana, to seek to prevent others from interfering with their

---

1. I will use the full names of Darryl Green and his codefendant Torrance Green in this memorandum, to distinguish them.

sales, and specifically, to carry on a violent dispute with a rival gang, the Franklin Hill Giants. That dispute allegedly led to a number of murders and attempted murders during a one year period in 2000 and 2001.[2]

There were multiple motions for severance from nearly every party, which I resolved. My goal in responding to the motions—like my goal in the instant motion—was to balance the substantial concerns of both sides. Accordingly, I made the following orders: Darryl Green and Jonathan Hart will be tried on January 10, 2005; Branden Morris and Edward Washington will be tried on April 11, 2005 (although I indicated that I would revisit their joinder following the completion of the Darryl Green/Hart trial). Torrance Green will be tried alone on July 11, 2005. In addition, I scheduled trial dates and set aside monthly hearings to expedite the proceedings. To date, the cases are progressing according to the schedule.

The issue before me principally concerns the conduct of the trials of the two death penalty defendants, Morris and Darryl Green. However, since the trial of each is joined with another defendant not facing the death penalty (Washington and Hart respectively), these issues in fact affect virtually all the defendants.

Should a penalty phase be necessary, there is no question that the government is entitled to death-qualify the *punishment* jury. *Witherspoon*, 391 U.S. at 520, 88 S.Ct. 1770. Specifically, the government may ask whether the venireman's views about the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (internal quotations omitted); *Witherspoon*, 391 U.S. at 520, 88 S.Ct. 1770.

Since the usual practice is to have a guilt trial followed by a penalty trial before the same jury, the usual result is that the Court death-qualifies the guilt jury as well.[3] Section 3593, for example, codifies this practice by providing that the capital hearing "shall be conducted—(1) before the jury that determined the defendant's guilt," or "before a jury impaneled for the purpose of the hearing if the jury that determined defendant's guilt was discharged for good cause." 18 U.S.C. § 3593(b).

But the usual practice of death-qualifying a single jury charged with hearing both liability and punishment is neither constitutionally nor statutorily required. It has simply evolved as a standard practice. Nothing prevents this Court from fashioning a different procedure more suit-

---

**2.** As I noted in my July 7, 2004, memorandum, defendants argue "that the government has no reasonable expectation that the several acts alleged in the indictment comprise acts in furtherance of an Esmond Street racketeering enterprise, because of Judge Wolf's findings in *United States v. Modlin*, 01–cr–10314–MLW. In *Modlin*, a drug distribution indictment in which three of the defendants here were named (along with others), the Court at sentencing rejected the allegation that anything like an Esmond Street conspiracy existed. Esmond Street, the Court concluded, involved nothing more than a group of people who hung out together in the same geographi-

cal area, and dealt drugs independently of one another." *Green*, 324 F.Supp.2d at 314–315.

**3.** Method One, which involved proceeding with the liability jury without death-qualification, and then picking the penalty phase jury from the existing jury, should there be a conviction on Count 16 does not even arguably run afoul of § 3593. If there are not enough death-qualified jurors to proceed to the penalty phase, the Court can find "good cause" and dismiss the existing jury and impanel a new one. But all parties reject this alternative.

ed to the facts of this case, to the exigencies of the Court's calendar, and to the promotion of fairness to both sides.

Defendants' claims raise the following questions:

1) Does 18 U.S.C. § 3593 require that the guilt/innocence jury and the punishment jury be one and the same?

2) If the punishment jury must be "death-qualified," does it follow that the guilt/innocence jury also must be "death-qualified"?

3) Can the defendant waive rights under § 3593 over the government's objection?

4) If these rights can be waived, how can the government's interests be protected?

## II. LEGAL FRAMEWORK

### A. 18 U.S.C. § 3593 Only Requires a Bifurcated Proceeding; it Does Not Mandate a Unitary Jury

#### 1. Gregg v. Georgia

In *Gregg v. Georgia*, 428 U.S. 153, 190–91, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court held that the Constitution requires a bifurcated proceeding in a death penalty case, one to determine guilt and the other to determine punishment. A single proceeding to resolve both issues, the Court found, had serious constitutional flaws. For example, the government would be obliged to introduce highly prejudicial evidence (like criminal record) that is not otherwise admissible. Limiting instructions would be inadequate to cure the prejudice suffered by the defendant. As the Court noted: "When a human life is at stake and when the jury must have information prejudicial to the question of guilt but relevant to the question of penalty in order to impose a rational sentence, a bifurcated system is more likely to ensure elimination of the constitutional deficiencies identified in *Furman v. Georgia* [408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) ]." *Id.* at 191–92, 96 S.Ct. 2909.

*Gregg*, however, did not address the issue of whether that bifurcated proceeding had to be held before a single jury or two juries. The Georgia statute which the Court reviewed involved a unitary jury, with a penalty phase immediately following a liability phase.[4] The issue before this Court was not raised.

#### 2. Death Qualification

Long before *Gregg* and the bifurcated jury requirement, it was a "nearly universal" practice for a state to permit the broad exclusion of veniremen with conscientious scruples against capital punishment.[5] In *Witherspoon* the Court scrutinized this practice, narrowing what "death qualification" meant. The Court vacated the sentence of a defendant from whose

---

**4.** Indeed, the statute, Georgia Laws, 1973, Act No. 74, p. 162, contemplated proceedings before a judge or a jury: "At the conclusion of all felony cases heard by a jury, and after argument of counsel and proper charge from the court, the jury shall retire to consider a verdict of guilty or not guilty without any consideration of punishment. In non-jury felony cases, the judge shall likewise first consider a finding of guilty or not guilty without any consideration of punishment. Where the jury or judge returns a verdict or finding of guilty, the court shall resume the trial and conduct a pre-sentence hearing before the jury or judge at which time the only issue shall be the determination of punishment to be imposed..." *See Gregg*, 428 U.S. at 208, n. 2, 96 S.Ct. 2909.

**5.** Michael W. Peters, "Constitutional Law: Does 'Death Qualification Spell Death for the Capital Defendant's Constitutional Right to an Impartial Jury?" [*Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) ] 26 Washburn L.J. 382, 382 n. 16 (1987).

jury the state had excluded all venire persons expressing any scruples against capital punishment. Such a practice, the Court held, created a "tribunal organized to return a verdict of death." *Witherspoon*, 391 U.S. at 541, 88 S.Ct. 1770. The only jurors who could be excluded were those who "made unmistakably clear ... that they would automatically vote against the imposition of capital punishment," or that they could not assess the defendant's guilt impartially. *Id.* at 522–523 n. 21, 88 S.Ct. 1770.

But again, *Witherspoon* and its progeny, *Wainwright*, did not address the question before me—whether the Court is obliged to death-qualify a unitary jury. While the Court raised concerns about the practice, and suggested two juries, it did not resolve the issue.

### 3. *Unitary Jury Versus Two Juries*

In *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Court finally addressed, albeit indirectly, the question of whether the Constitution permits or prohibits a unitary jury or dual juries. In *Lockhart* the court concluded that the practice of death-qualifying the unitary jury did not violate a defendant's rights.[6] *See also Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987)(finding that the use of death-qualified jury for a joint trial in which the death penalty was sought only against one defendant did not violate the Sixth Amendment right to an impartial jury). Death-qualification of the unitary jury, in short, on the record then presented to the Court,[7] did not raise constitutional issues.

But that conclusion did not suggest its opposite, which the government argues here—that a court *must* have a unitary jury, that the unitary jury *must be* death-qualified in all cases, and indeed, that the government has a right to a death-qualified unitary jury. The precise question in *Lockhart* was whether "the Constitution prohibit[s] the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial." *Id.* at 165, 106 S.Ct. 1758. The Court held that the Constitution did not *prohibit* the removal of death penalty opponents for cause. Importantly, it did not hold that the Constitution *requires* the removal of death penalty opponents prior to the guilt phase.

Indeed, dicta in *Witherspoon* supports the view that a unitary jury is not mandated. In *Witherspoon*, the Court addressed the state's interest "in submitting the penalty issue to a jury capable of imposing capital punishment" on the one hand, and

---

**6.** In *Lockhart*, the defendant offered studies suggesting that juries from which jurors who were opposed to the death penalty were excluded were more "conviction prone" than other juries, studies whose validity the Court questioned but adopted for the purposes of the decision. *See* Judge Nancy Gertner & Judith Mizner, *The Law of Juries*, Ch. III, part 2(A)(3) (Glasser LegalWorks 1997). The Court held that even assuming *arguendo* that a death-qualified jury was conviction-prone, it did not violate the fair cross-section requirement because the petit jury was involved and not the jury venire. Moreover, even if the fair cross-section requirement were applied to a petit jury, a group of people sharing a fixed opposition to the death penalty was not a cognizable group within the meaning of the Fourteenth Amendment. Finally, the Court also focused on the jury actually impaneled in *Lockhart* and found there was nothing to suggest that any particular juror was partial. *Id.*

**7.** The Court found the record "fragmentary" and "tentative." *Lockhart*, 476 U.S. at 170, 106 S.Ct. 1758. Defendants have offered more recent studies which they seek to use to confirm the defendant's position in *Lockhart* and address the Court's concerns. *See infra* Section II(B).

the defendant's "interest in a completely fair determination of guilt or innocence," on the other. The Court suggested that one way to accommodate these concerns was to use one jury to decide guilt and another to fix punishment. *Witherspoon*, 391 U.S. at 520 n. 18, 88 S.Ct. 1770.[8] While the *Lockhart* court ultimately concluded that that accommodation was not mandated by the Constitution,[9] nothing in the decision suggests that a court could not implement it in an appropriate case. In any case, the fact that the Court did not find a violation of defendant's constitutional rights, and thus, that there was no need to accommodate those rights with the state's concerns, did not somehow "constitutionalize" the state's interest in the quickest and most efficient capital trial.

### 4. § 3593 Does Not Require a Unitary Trial; to the Extent it Can Be So Interpreted, the Requirement Can Be Waived

The relevant statute, 18 U.S.C. § 3593, seems to reflect the long-standing practice of a unitary jury. It provides that the capital sentencing hearing "shall be conducted (1) before the jury that determined the defendant's guilt," or (2) "before a jury impaneled for the purpose of the hearing if . . . the jury that determined defendant's guilt was discharged for good cause." 18 U.S.C. § 3593(b).

The government argues that there is no authority for the proposition that the court can decide in advance to discharge the guilt jury before the sentencing hearing for "good cause." *See* 18 U.S.C. § 3593(b)(2)(C).[10] Defendants argue that "evidence of systematic error" in administering the death penalty, particularly where a defendant was convicted by a death-qualified jury, rises to the level of "good cause" for dismissing the liability jury and impaneling a separate sentencing jury.

■ In any event, whatever rights accrue to the defendant under § 3593 can be waived. In effect, by objecting to death-

---

**8.** The Court said:
> [A] defendant convicted by . . . a [unitary] jury in some further case might still attempt to establish that the jury was less than neutral with respect to guilt. If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence—given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment. That problem is not presented here, however, and we intimate no view as to its proper resolution.

*Witherspoon*, 391 U.S. at 520 n. 18, 88 S.Ct. 1770.

**9.** *See Lockhart*, 476 U.S. at 184, 106 S.Ct. 1758 (Marshall, J. dissenting).

**10.** The government cites *United States v. O'Driscoll*, 250 F.Supp.2d 429 (M.D.Pa.2001),

for the proposition that "good cause" cannot be determined at the beginning of the case, prior to the first jury returning a verdict on guilt. However, *O'Driscoll* is not binding on this Court, and moreover addresses a factual scenario that does not raise the kind of prudential concerns driving this Court's decision. The judge in that case faced a trial involving one defendant and one murder charge. This Court faces five defendants, three trials, and dozens of charges. Even absent the task of death-qualifying the jury, voir dire is bound to be lengthy and complex. Thus, the court in *State v. Monturi*, 195 N.J.Super. 317, 478 A.2d 1266 (1984) supported an approach identical to this Court's: ("[T]he concepts of due process, fundamental fairness and judicial economy permit the court to declare before the guilt phase... that a non 'death-qualified' jury will be impaneled to hear the guilt phase and a separate 'death-qualified' jury will be impaneled to hear the penalty phase if required," *id.* at 325, 478 A.2d 1266).

qualifying the guilt jury, defendants are waiving the provisions of § 3593 that arguably oblige the Court to hold guilt and punishment trials before the same jury.[11]

If the right to appeal from a sentence can be waived along with a long list of other rights, surely § 3593 rights can be waived. *See, e.g., United States v. Teeter,* 257 F.3d 14 (1st Cir.2001) (presentence waivers of appeal right are presumptively valid if knowing and voluntary.)

### a. Government's Rights to a Fair Jury Will Not Be Violated by a Dual Jury Procedure

■ In my first decision I indicated that the government did not have a right to a death-qualified jury to hear the question of guilt. The government responded that it has the "right to have a jury of fair minded citizens who are able to apply the law Congress has enacted." And it cites as an example, "a juror does not have to agree with the drug laws in order to sit on a jury for a drug case, but his or her feelings about the drug laws must not be such as to prevent them from fairly rendering a verdict based on the evidence."

■ But following with the drug analogy: The government has a right to question a juror about whether he agrees or disagrees with the prosecution of individuals for drug offenses. They plainly would not have the right to question a juror about whether he or she thinks 20 years is too long for someone convicted of the crime. In the ordinary case, voir dire does not and *should not* include questioning about punishment, e.g., what a juror's feelings are about convicting of "x" crime if it results in "y" sentence. Neither should the liability jury voir dire here.

*Witherspoon* and *Wainwright* involved a unique series of questions geared to a juror's ability to impose the death penalty—whether views about the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright,* 469 U.S. at 424, 105 S.Ct. 844 (internal citations omitted). The liability jury will not be deciding whether to impose the death penalty, any more than an ordinary jury would.[12]

Indeed, in the usual criminal case, courts are scrupulous about avoiding telling jurors about punishment. In *Pope v. United*

---

**11.** In *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), discussed *infra,* the Supreme Court conjectured that a defendant may benefit from being able to appeal at sentencing to the "residual doubts" of the same jurors who found him guilty. *Lockhart,* at 181, 106 S.Ct. 1758. In his dissent, Justice Marshall found the majority's concern disingenuous, "unless the state is willing to grant the defendant the option to waive this paternalistic protection in exchange for better odds against conviction." *Id.* at 205, 106 S.Ct. 1758 (Marshall, J., dissenting) (internal citations omitted). It is further troubling, he wrote, to appeal to "a defendant's power to appeal to 'residual doubts' at his sentencing," *Id.* at 206, 106 S.Ct. 1758, when the Court consistently refuses to reexamine lower court decisions precluding defendants from explicitly appealing to these doubts during sentencing proceedings. *See, e.g., Burr v. Florida,* 474 U.S. 879, 106 S.Ct. 201, 88 L.Ed.2d 170 (1985) (Marshall, J., dissenting from denial of certiorari).

In any event, even if there is an advantage that could accrue to the defendant with a unitary system, these defendants have chosen to waive it.

**12.** The *Witherspoon* quote cited by the government makes this clear: "The most that can be demanded of a venireman in this regard is that he *be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings.*" *Witherspoon,* at n. 21 (italics supplied).

*States,* 298 F.2d 507 (1962), for example, the Court stated, "To inform the jury that the court may impose minimum or maximum sentence . . . or other matters relating to disposition of the defendant, tend to draw the attention of the jury away from their chief function as sole judges of the facts, open the door to compromise verdicts and to confuse the issue or issues to be decided." *Id.* at 508; *see also Shannon v. United States,* 512 U.S. 573, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994).[13]

Indeed, the observations of *Shannon* and *Pope* apply with special force here, given the data on the "conviction proneness" of death-qualified juries, on the one hand, and the Court's concerns about jury nullification in *Wainwright* and *Witt* on the other. If the liability and punishment functions are separated, there is no reason to risk prejudice to either side by death-qualifying a jury addressing only the former.

### b. *The Government's Concerns about Cost, and Impact of Multiple Proceedings on its Witnesses Can Be Accommodated Through Other Means*

■ The government argues that it is unfair to require its witnesses to partici-pate in multiple proceedings. As I noted in my memorandum on severance, multiple liability proceedings are already required here because of the scope and complexity of the government's indictment—five defendants, a racketeering conspiracy spanning 15 months, antagonistic defenses, co-conspirator's statements.

It is premature to conclude that there will be a need for a punishment phase at all. The capital defendants have a substantial defense—whether the Esmond Street Posse is a gang at all, and whether whatever it is meets the requirements of RICO. While many defendants may make similar claims, these defendants have support for their position in Judge Wolf's findings in *Modlin.* *See Green,* 324 F.Supp.2d at 321 n. 16. Moreover, even if Esmond Street were found to be a gang and a racketeering enterprise, the defendants' submissions suggest that there will be defenses to the claim that the murders at issue were in furtherance of that enterprise, or motivated by some other concern.[14]

The government concedes the fact that death-qualification of the punishment jury would add substantially to the time it takes for the Darryl Green/Hart trial and the Morris/Washington trial. Indeed, the gov-

---

**13.** In *Pope,* the Fifth Circuit held that the trial court properly refused the defendant's requested jury instruction that if the defendant were found not guilty on the ground of insanity, the court would commit him to a state mental institution until he was cured and it was deemed safe to release him. *Pope,* 298 F.2d 507. Likewise, in *Shannon,* the Supreme Court held that the Insanity Defense Reform Act does not require a jury instruction regarding the consequences to the defendant of a verdict of not guilty by reason of insanity, except under certain limited circumstances. *Shannon,* 512 U.S. 573, 114 S.Ct. 2419. Both cases emphasized the limited function of the jury to find the facts and to decide whether, on those facts, the defendant is guilty of the crime(s) charged; information regarding the consequences of the verdict is thus irrelevant to the jury's task. *Id.* at 579, 114 S.Ct. 2419.

**14.** Morris's counsel, by way of affidavit, suggests that three periods of violence can be discerned from the discovery so far—the first spurt of violence, from September 8 to 16, 2001, caused by "a lack of respect" (when one individual bumped into another and refused to apologize), the second in April of 2001, with no known motive, and the third on August 24, and 25, 2001, over a young woman. Affidavit of Patricia Garin, attached to Morris' Supplemental Memorandum in Support of Motion to Sever Count Eleven [docket # 165] filed June 18, 2004.

ernment's view of what death-qualification requires substantially underestimates the time it will take in a case with multiple defendants and counsel. In a system using separate juries for guilt and penalty phases, time and resources would be saved every time a capital case did not require a penalty phase. It is entirely appropriate for this Court to avoid devoting such substantial resources to jury selection prior to the guilt phase when a "not guilty" verdict as to the murder count would render death-qualification unnecessary.

To be sure, the government plainly has an important interest in avoiding the unnecessary repetition of the trauma, fear, and risk associated with testifying for witnesses and victims of the charged violence. But that concern can be accommodated in a variety of ways, such as stipulated summaries of evidence, transcripts and videoconferencing. *See, e.g.,* Bruce Winick, *Prosecutorial Peremptory Challenge Practices in Capital Case: An Empirical Study and a Constitutional Analysis,* 81 Mich. L.Rev. 1, 57 (1982).

### B. *Unique Complexity of Death–Qualifying a Massachusetts Jury*

■ As I noted in my initial order, studies suggest that death-qualification leads to the exclusion of a disproportionate number of black and female jurors, especially in this Commonwealth. Defendant's preliminary data suggests that African–Americans are under-represented in the jury venire [15] in the Eastern Division of Massachusetts, by as much as half their representation in the community—particularly that 7.8%—9.1% of residents in the Eastern Division of Massachusetts are in whole or in part African–American, that a significantly smaller percentage are included in the jury venire, that in the United States population 48% of black people (but only 22% of whites) oppose the death penalty, and that 45% of Massachusetts voters overall oppose the death penalty. *See Green,* 324 F.Supp.2d at 329. Death-qualifying a jury could significantly deplete the already paltry number of minority jurors in the Eastern District.

Initial data gathered by defendants [docket entry # 56] indicates that economic status and racial compositions of cities are closely connected to the return rates of the local census, which determines which names are placed on the Master Jury Wheel. Defendant Branden Morris' *Ex Parte* Motion for Funds For Andrew Beveridge, filed August 23, 2004, at ¶ 9. Potential jurors whose names are placed on the Master Wheel by the Federal Jury Commissioner are mailed a jury summons and a juror questionnaire. *Id.* Further preliminary research by defendants indicates that only approximately half of the summonses mailed are returned with completed questionnaires, and that, of the questionnaires returned over the last three years, the percentage returned by African–Americans was around 3%. *Id.*

These two factors—the large percentage of African–Americans who are opposed to the death penalty and the disproportionately small number of African–Americans in the Eastern District of Massachusetts jury venire—de facto exclude all or most African–Americans from a death-qualified jury.

This result was clear in *United States v. Gilbert* (98–cr–30044–MAP), where of the 600 people who completed questionnaires, the court conducted voir dire of 203 jurors to qualify sixty-four. Only eight black individuals were voir dired—six opposing the death penalty (75%) and two favoring death penalty only in special circumstances (25%). *No black jurors were seated.* The

---

15. Defendants do not yet have data on the

Master Jury Wheel.

result was the same in *United States v. Sampson,* (01–cr–10384–MLW) [16] where of the 498 jurors that completed questionnaires only twenty-three identified themselves as black (4.6%). Of the potential black jurors, ten (43.5%) were opposed to the death penalty, one (4.3%) was in favor of the death penalty, and ten were neutral (43.5%). *No black jurors were seated on that jury either.*[17]

Moreover, similar studies raise the serious concern that death-qualified juries are more conviction prone. In both of the cases where it considered the issue—*Witherspoon* and *Lockhart*—the Supreme Court has rejected this argument citing "tentative and fragmentary" data. *Lockhart* at 170, 106 S.Ct. 1758 (citing *Witherspoon* at 517–18, 88 S.Ct. 1770). Notably, the Court did not wholly foreclose any constitutional infirmities stemming from conviction-prone death-qualified juries. *See Witherspoon* at 517–518, 88 S.Ct. 1770 ("We simply cannot conclude... *on the basis of the record now before us... In light of the presently available information...* " that excluding jurors opposed to capital punishment increases the risk of conviction to the level of constitutional infirmity) (emphasis added). In the years since *Witherspoon* and *Lockhart* were decided, significant social science research has been devoted to studying the effect of death-qualification on jurors.

Updated data presented by defendants in this case overwhelmingly shows that death-qualified jurors are significantly more conviction prone than jurors who are not death qualified. For example, nearly one half (49.2%) of all death-qualified capital jurors make their sentencing decision before the penalty phase of the trial even begins. Darryl Green and Branden Morris's Supplemental Memorandum On the Issue of Impaneling Separate Juries, filed September 10, 2004, at p. 6 (citing William Bowers and Wanda Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing,* 30 Crim. Law Bulletin 51, 56 (2003)). Several qualitative studies found that jurors who were exposed to the potential punishment during jury selection have a propensity to believe that the subtext of the voir dire is that the trial is not about whether the defendant committed the underlying crime but about what punishment the defendant should receive. *Id.* at 9–10 (citing Craig Haney, *On the Selection of Capital Juries: The Biasing Effects of the Death–Qualification Process,* 8 Law & Human Behavior 121 (1984); *Examining Death Qualification: Further Analysis of the Process Effect,* 8 Law & Human Behavior 133 (1984); Haney, Hurado & Vega, *"Modern" Death Qualification: New Data on Its Biasing Effects,* 18 Law & Human Behavior 619

---

16. The defense team in *Sampson* also compiled data on gender and attitudes towards the death penalty. Forty-three percent of the women, as opposed to 31.4% of the men were opposed to the death penalty. These numbers indicate a more pronounced differential than nationwide statistics indicating that 30% of women and 22% of men oppose the death penalty.

17. These numbers present a stark comparison with the attitudes of potential white jurors who completed questionnaires. In *Gilbert,* 170 jurors identified themselves as white, Caucasian, or of European origin—fifty-eight

(34.1%) were opposed to the death penalty, fifty-six (32.9%) were generally in favor of the death penalty, and twenty-three (13.5%) approved of the death penalty in certain circumstances. In *Sampson,* 451 (90.1%) identified themselves as white—181 (40.1%) were in favor of the death penalty, 100 (22.2%) were neutral, and 170 (37.7%) were opposed. While I recognize the limitations of these statistics—the small sampling size, the limited amount of data available on the reasons for dismissal, the opinion characterizations created by defense counsel—these numbers give me great pause.

(1994)). These findings represent just a sliver of the recent data indicating that death-qualified jurors are skewed to be conviction-prone.

While this decision does not rest on the conviction-prone juror problem, and its constitutional implications, it surely affects my obligations as a trial judge. Death penalty qualification hinders my responsibility to facilitate, to the best of my ability, a fair trial on guilt. It provides an additional "good cause" justifying bifurcating the juries in the trials of the capital defendants before me.

## III. CONCLUSION

For all the above reasons, I will impanel a jury to decide guilt/innocence and, if necessary, a separate jury to decide penalty. I will "death-qualify" only the latter jury.

**SO ORDERED.**