# United States Court of Appeals
## For the First Circuit

No. 05-1014

UNITED STATES OF AMERICA,
Appellant,

v.

DARRYL GREEN ET AL.,
Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

No. 05-1151

IN RE UNITED STATES,
Petitioner.

PETITION FOR A WRIT OF MANDAMUS TO THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Selya, Lynch and Lipez,

Circuit Judges.

Steven L. Lane, Attorney, Appellate Section, Criminal Division, U.S. Dep't of Justice, with whom Michael J. Sullivan, United States Attorney, Theodore B. Heinrich and Lori J. Holik,

Assistant United States Attorneys, were on brief, for appellant.

Max D. Stern, with whom Randolph Gioia, Elizabeth Billowitz, Sarah Jennings Hunt, William Brennan, and Brennan, Trainor, Billman & Bennett, LLP were on brief, for appellee Darryl Green.

Max D. Stern, with whom Patricia Garin, Kenneth M. Resnik, Jeffrey Wiesner, Stern, Shapiro, Weissberg & Garin, LLP, David P. Hoose, and Katz, Sasson, Hoose & Turnbill were on brief, for appellee Branden Morris.

John H. Cunha, Jr., with whom George F. Gormley, Christie M. Charles and George F. Gormley, P.C. were on brief, for appellee Jonathan Hart.

John H. Cunha, Jr., with whom Stephen Super and Cunha & Holcomb, P.C. were on brief, for appellee Edward Washington.

Judith H. Mizner on brief for Federal Defender Office, amicus curiae.

---

May 12, 2005

---

**SELYA**, <u>**Circuit Judge**</u>. The district court, presiding over a complex multi-count, multi-defendant capital case, issued a pretrial order calling for the empanelment of two separate juries: one to determine guilt and the other, totally different in composition, to determine whether to impose the death penalty. Before us, the government asserts that the Federal Death Penalty Act (FDPA) forbids this binary course of action. We conclude that the district court's unprecedented order presents a basic, previously undecided question of substantial public importance and, accordingly, entertain the government's petition for advisory mandamus. Exercising that jurisdiction, we proceed to correct and countermand the district court's erroneous interpretation of the FDPA.

## I. BACKGROUND

In 2003, a federal grand jury sitting in the District of Massachusetts charged five men in a seventeen-count superseding indictment. The golconda of charges included racketeering, 18 U.S.C. § 1962(c); racketeering conspiracy, <u>id.</u> § 1962(d); murder in aid of racketeering, <u>id.</u> § 1959(a)(1); and conspiracy to commit murder in aid of racketeering, <u>id.</u> § 1959(a)(5). Four of the five defendants — Darryl Green, Branden Morris, Jonathan Hart, and Edward Washington — are parties to this proceeding. We focus exclusively on them.

The indictment alleged that the foursome were all members of the Esmond Street Posse, variously described as a Boston street gang or criminal enterprise, which was engaged in peddling marijuana and crack cocaine. Count Sixteen of the indictment charged Green and Morris, but not Hart or Washington, with the murder of one Terrell Gethers in aid of racketeering. Under the controlling statute, 18 U.S.C. § 1959(a)(1), that was a capital charge, carrying a potential penalty of death for the two affected defendants.

In response to a flurry of severance motions, see Fed. R. Crim. P. 14, the district court ruled that the capital defendants should not be tried together. United States v. Green, 324 F. Supp. 2d 311, 324-25 (D. Mass. 2004) (Green I). Relatedly, the court decreed that Hart would be tried with Green and that Washington would be tried with Morris. Id. at 326-28. These rulings brought to the fore a concern previously voiced by the non-capital defendants, Hart and Washington, who had posited that it would be unfair to force them to trial before a death-qualified jury.

We pause to place this concern into proper perspective. The Supreme Court has held that, in a capital case, the government may exclude from jury service those individuals whose personal opposition to the death penalty is such that it would prevent or substantially interfere with their ability to apply the law. Wainwright v. Witt, 469 U.S. 412, 424 (1985). The process of

-4-

winnowing out such conscientious objectors in jury selection is known as death-qualification.

A capital case potentially involves two separate trial phases. In the first phase, the jury determines whether the capital defendant is guilty of the crime(s) charged. If the defendant is convicted of a capital offense, a second proceeding ensues to determine whether that offense, under the circumstances of the case, warrants the death sentence. As a single jury normally hears both the guilt and penalty phases, death-qualification occurs as part of the original jury empanelment.

The defendants in this case insist that the process of selecting a single death-qualified jury to consider both the guilt and penalty phases has the correlative effect of putting a jury in the box that will be more prone to convict. To support this notion, the defendants proffered below statistical evidence purporting to indicate that African-Americans were significantly underrepresented in the local jury venire and that death-qualification would further reduce the possibility that any African-Americans — a group more likely to oppose the death penalty than non-African-Americans — would be able to serve on the jury. The defendants also tendered statistical evidence indicating a similar, though less pronounced, effect as to potential female jurors. The defendants then submitted studies purporting to show that death-qualified jurors are significantly more likely to

convict than non-death-qualified jurors. Hart and Washington argued that these perceived consequences of death-qualification were particularly unfair as applied to defendants who were not themselves facing the death penalty.

In responding to these plaints, the district court conceded that the defendants (including the non-capital defendants) had no constitutional entitlement to a non-death-qualified jury. See Green I, 324 F. Supp. 2d at 330 (citing Buchanan v. Kentucky, 483 U.S. 402 (1987)). The court, however, did not stop there; it viewed the defendants' importunings as raising a case management issue within the realm of trial court discretion. Id.

Noting the concerns enumerated by the non-capital defendants along with the potential strain on judicial resources that would accompany a further proliferation of the number of trials needed, the court devised two potential solutions and invited briefing on them. One entailed selecting a single jury (including the maximum number of alternates) for each trial, but deferring death-qualification until after the guilt phase had concluded. If a capital conviction ensued, the court would then attempt to death-qualify the jury before the penalty phase began and, if the number of remaining jurors and alternates fell below the requisite twelve, would discharge that jury and empanel a new, death-qualified jury exclusively for the penalty phase. Id. at 331. The second proposal contemplated selecting two distinct

juries at the outset, one (non-death-qualified) to hear the guilt phase and the other (death-qualified) to hear the penalty phase. Id.

In the briefing that followed, the government denigrated both options and the defendants lobbied for the second. On November 3, 2004, the district court ordered two juries empaneled for each of the scheduled trials (one to adjudicate guilt and the second, if needed, to fix the nature of the penalty). United States v. Green, 343 F. Supp. 2d 23, 25 (D. Mass. 2004) (Green II). The court determined that the applicable provision of the Federal Death Penalty Act, 18 U.S.C. § 3593(b), did not require a unitary jury. Id. Even if it did, the court held, the defendants were entitled to waive the requirement. Id.

The government appealed this order and filed a protective petition for a writ of mandamus under the All Writs Act, 28 U.S.C. § 1651(a). We turn first to the jurisdictional question and then to the merits of the lower court's order.

## II. APPELLATE JURISDICTION

The government's roadmap to review traces several possible avenues through which our jurisdiction may attach. We can entertain an interlocutory appeal, the government says, because the order appealed from is a collateral order, that is, an order that conclusively determines an important legal question, which is completely separate from the merits of the underlying action and is

effectively unreviewable by means of a archetypical end-of-case appeal. See, e.g., Rhode Island v. U.S. EPA, 378 F.3d 19, 25 (1st Cir. 2004) (noting circumstances in which interlocutory orders are immediately appealable under the collateral order doctrine); In re Nineteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig., 982 F.2d 603, 608-09 (1st Cir. 1992) (similar); see also Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 545-47 (1949).

We view the use of the collateral order doctrine as problematic in the circumstances of this case. This court has been wary of creating running room for back-door attempts to evade the longstanding rule that appeals by the government in criminal cases must be specifically authorized by statute. See United States v. Watson, 386 F.3d 304, 307-08 (1st Cir. 2004); United States v. Kane, 646 F.2d 4, 5-7 (1st Cir. 1981). This wariness arises, in part, because of a realization that criminal matters are different — and special concerns counsel against permitting government appeals in criminal cases under the collateral order doctrine. See United States v. Horn, 29 F.3d 754, 768-69 (1st Cir. 1994). Among them are "speedy trial and double jeopardy concerns." Id. at 768; see also United States v. McVeigh, 106 F.3d 325, 330-32 (10th Cir. 1997) (per curiam) (citing Horn and noting that the "principal prudential bases are the avoidance of undue delay, and the avoidance of harassment" (citations omitted)).

At a bare minimum, then, allowing a government appeal to go forward by way of the collateral order doctrine in a criminal case requires both that "the conditions of the collateral order doctrine are satisfied, and [that] the prudential concerns that traditionally militate against allowing the government to appeal in a criminal case favor, or are at least neutral in respect to, the availability of a government appeal." Horn, 29 F.3d at 769. This court has found such concerns overcome only on rare occasions, such as where, prior to the entry of the order appealed from, guilt has been determined, sentence imposed, "and no prospect of piecemeal litigation endures." Id. at 768-69. Because it is arguable how these prudential concerns cut in this case, we question whether an appeal from a dual jury order in a criminal case comes within the narrow purview of the collateral order doctrine. This doubt is all the more profound because of our uncertainty about whether an order affecting sentencing procedure can be considered "completely separate" from the merits of the underlying action. See Sell v. United States, 539 U.S. 166, 176 (2003) (permitting collateral appeal in criminal case when issue was wholly distinct from "questions concerning trial procedures"); McVeigh, 106 F.3d at 328, 332 (holding order barring victim-impact witnesses from observing guilt phase of capital trial not sufficiently separate from merits of case); United States v. Patterson, 882 F.2d 595, 599 (1st Cir. 1989) (holding that the "sentencing process . . . is an integral

-9-

aspect" of a criminal case and "is not in any sense independent of the main course of the prosecution" (citations and internal quotation marks omitted)).

In the final analysis, we need not definitively resolve the appealability question. Review is available, in our discretion, by way of mandamus. We explain briefly.

Broadly stated, there are two types of mandamus. The more common is supervisory mandamus. See, e.g., In re Atlantic Pipe Corp., 304 F.3d 135, 139-40 (1st Cir. 2002); Horn, 29 F.3d at 769 & n.19. That strain of mandamus generally is limited to situations in which the party seeking the writ has a clear entitlement to relief, yet is threatened with irreparable harm should that relief be delayed or deferred. See, e.g., In re Sterling-Suárez, 306 F.3d 1170, 1172 (1st Cir. 2002); In re Cargill, Inc., 66 F.3d 1256, 1260 (1st Cir. 1995). The defendants argue that neither requirement is met here — and they are probably correct with respect to the second requirement.

The government suggests that it shares an interest with the public at large in seeing that the courts properly apply the FDPA — an interest that would be irreparably harmed if the district court proceeded with dual juries despite a contrary statutory command. This suggestion lacks force. If a blow to the public interest caused by a court's erroneous interpretation of a statutory provision were to constitute irreparable injury, the bar

-10-

would be set so low as to render the requirement superfluous.  As Justice Rehnquist wrote, "to issue a writ of mandamus under such circumstances would undermine the settled limitations upon the power of an appellate court to review interlocutory orders."  Will v. Calvert Fire Ins. Co., 437 U.S. 655, 661 (1978) (plurality op.) (citation and internal quotation marks omitted).

The second type of mandamus — known as advisory mandamus — is more apt in the circumstances at hand.  Mandamus, in any form, is an extraordinary remedy, but advisory mandamus is available only in a tiny subset of cases.  Such cases are those that present novel questions of great significance which, if not immediately addressed, are likely to recur and to evade effective review.  Horn, 29 F.3d at 769.  The aim of advisory mandamus, then, is to settle substantial questions of law in circumstances that "would assist other jurists, parties, [and] lawyers."  Id. at 770.  To obtain relief under this species of mandamus, the petitioner does not need to show irreparable harm.  See Atlantic Pipe, 304 F.3d at 140.

This case lends itself to an application of the advisory mandamus doctrine.  The district court's interpretation of section 3593(b) is unprecedented, and it hardly needs explaining why proper death penalty procedure is of great importance to the administration of justice.  If the propriety of the district court's interpretation is not evaluated here and now, it would very

-11-

likely evade review.  On the one hand, if successive juries convict and then impose the death penalty, the government will not be able to appeal this favorable verdict, see United States v. Moran, 393 F.3d 1, 12 (1st Cir. 2004), and the defendants, having urged the district court to abandon a unitary jury in favor of dual juries, could not be heard to complain about this procedural innovation, see United States v. Angiulo, 897 F.2d 1169, 1216 (1st Cir. 1990) (holding that a criminal defendant cannot complain of invited error).  On the other hand, if the first jury acquits or the second jury declines to impose capital punishment, the defendants will have no incentive to appeal and double jeopardy principles will prevent the government from doing so.  See Watson, 386 F.3d at 308; see also Sattazahn v. Pennsylvania, 537 U.S. 101, 106 (2003) (noting that "the Double Jeopardy Clause [applies] to capital-sentencing proceedings where . . . the prosecution [must] prove certain statutorily defined facts beyond a reasonable doubt to support a sentence of death").[1]

To cinch matters, the question will almost certainly recur.  There is a longstanding belief in certain quarters, shared by the defendants in this case, that an accused's guilt or innocence is likely to be judged less harshly by a non-death-qualified jury.  Indeed, a federal district court in Texas already

---

[1]To be sure, a defendant might be able to test, by an end-of-case appeal, an order refusing to constitute dual juries.  However, that is not the type of order with which we are confronted.

has relied on the procedural innovation implemented in this case as precedent for issuing a similar order in a different capital case. See United States v. Williams, 400 F.3d 277, 282 & n.4 (5th Cir. 2005) (per curiam) (vacating district court's order). Consequently, we deem this case an appropriate candidate for the exercise of our advisory mandamus authority.

## III. ANALYSIS

The district court's primary justification for its dual jury order rests with its interpretation of the relevant section of the FDPA. The court concluded that 18 U.S.C. § 3593(b) permits a court to decide, before trial commences, that good cause exists to discharge the original jury once it has adjudicated the defendant's guilt and then empanel a new jury for the penalty phase. Green II, 343 F. Supp. 2d at 30; Green I, 324 F. Supp. 2d at 331. As a secondary ground, the court held that if the statute does require a unitary jury to be empaneled at the outset of the trial, the defendant may unilaterally waive that requirement. See Green II, 343 F. Supp. 2d at 30-31; Green I, 324 F. Supp. 2d at 331-32.

18 U.S.C. § 3593(b) provides that if a defendant is found guilty or pleads guilty to a capital offense, there "shall" be a separate sentencing hearing. Id. The statute further provides that "[t]he hearing shall be conducted before the jury that determined the defendant's guilt." Id. § 3593(b)(1). The statute proceeds to carve out a series of exceptions. These contemplate

-13-

that the penalty phase may be conducted before a jury empaneled for that purpose alone if — and only if — one of four circumstances obtains:

> (A) the defendant was convicted upon a plea of guilty;
> (B) the defendant was convicted after a trial before the court sitting without a jury;
> (C) the jury that determined the defendant's guilt was discharged for good cause; or
> (D) after initial imposition of a sentence under this section, reconsideration of the sentence under this section is necessary . . . .

Id. § 3593(b)(2). Finally, the statute provides that the penalty phase may be tried "before the court alone, upon the motion of the defendant and with the approval of the attorney for the government." Id. § 3593(b)(3).

The question before us concerns the proper interpretation of section 3593(b)(2)(C). The government argues that this is a narrow jury-discharge provision that only comes into play if, after a finding of guilt, good cause to discharge the original jury arises. The defendants argue that this is a broader, more malleable provision, one that should be construed against the backdrop of a trial court's extensive case management powers. On this basis, the defendants exhort us to hold that section 3593(b)(2)(C) requires only that the discharge of the guilt phase jury must occur before a new penalty phase jury is empaneled. As a necessary corollary of this interpretation, the defendants reason that the district court may decide at any time — even in advance of

-14-

trial — that it will discharge the guilt phase jury for what it deems to be good cause and empanel a new jury for the penalty phase.

In mulling the validity of these competing claims, we start with the text of the statute. See Sepulveda v. United States, 330 F.3d 55, 64 (1st Cir. 2003). Section 3593(b)(2)(C) says that a new penalty phase jury will hear the case if "the jury that determined the defendant's guilt was discharged for good cause." That phrasing tells us a great deal about Congress's intent. The use of the word "determined," in the past tense, makes clear that the phrase "discharged for good cause" refers to discharge for events arising after the guilt phase has been concluded. See Jones v. United States, 527 U.S. 373, 418 (1999) (Ginsburg, J., dissenting) (opining that "[d]ischarge for 'good cause' under § 3593(b)(2)(C) . . . is most reasonably read to cover guilt-phase . . . juror disqualification due to, e.g., exposure to prejudicial extrinsic information or illness"); see also id. at 381 (majority op.) (expressing agreement with dissent's interpretation of the phrase "good cause"); Williams, 400 F.3d at 282. This makes perfect sense: jurors who originally were qualified to sit may, by some untoward exposure or affliction, become incapacitated after the guilt phase ends but before the penalty phase ends so that a properly empaneled jury that has determined guilt will not be able to continue to serve.

-15-

The structure of a statute often informs its text.  See Plumley v. S. Container, Inc., 303 F.3d 364, 369 (1st Cir. 2002); United Techs. Corp. v. Browning-Ferris Indus., Inc., 33 F.3d 96, 99 (1st Cir. 1994).  Here, the structure of section 3593(b) reinforces the reading suggested by its plain language.  The default rule, expressed in subsection (b)(1), is that the jury that determines the guilt phase of a federal capital case shall also serve as the jury that determines the penalty phase.  That provision is set forth first, in mandatory language and without condition.  Subsection (b)(2) spells out four exceptions to the default rule of subsection (b)(1).  That subsection is conditional; it directs that a new jury shall be empaneled for the penalty phase "if" one of four situations arises.

The common denominator among these four exceptions is that they all appear to represent situations in which it is either impossible or impracticable to apply the default rule of a unitary jury.  This is unarguably true of subparagraphs (A) and (B); each of those subparagraphs deals with a situation in which guilt is not determined by a jury at all.  That is also readily apparent with respect to subparagraph (D).  The vast majority — if not all — of situations requiring the reconsideration of an imposed sentence will be those that occur when direct or collateral review has identified, months or years later, some defect in the original sentencing proceeding.  Assuming that a jury participated in the

-16-

original proceeding, it would have been long since discharged and recalling it would, for a variety of reasons, be infeasible.

Structurally, this leads to the conclusion that subparagraph (C) should be read as referring to those situations in which empaneling a fresh penalty phase jury is unavoidable because of some exigency associated with, or arising after, the determination of the defendant's guilt. This is the most natural (and, therefore, the favored) reading of the statute. So construed, subsection (b) presents a coherent, unified theme: a single, properly constituted jury will hear both phases of a federal capital trial unless circumstances definitively rule out that option.

The defendants read the statute differently. They invite us to find that the function of subsection (b)(2)(C) is to vest in the district court wide discretion as to whether one or two juries is appropriate in a particular capital case. In their view, Congress's choice of language was intended only to prevent two such juries from being sworn simultaneously. This is resupinate reasoning.

First and foremost, the defendants' reading contradicts the structure of the statute by turning the "good cause" language, clearly written in the form of an exception, into a threshold question to be posed at the time of the original jury empanelment in every capital case. Moreover, even if we were disposed to

-17-

ignore the structure of the statute — which we are not — construing the language of subparagraph (C) as providing wide trial court discretion over the deployment of dual juries would require a linguistic contortion to reach a result that Congress could have accomplished much more simply and straightforwardly. Courts ought to construe statutes, whenever possible, "in a commonsense manner, honoring plain meaning, and avoiding absurd or counter-intuitive results." United States v. Carroll, 105 F.3d 740, 744 (1st Cir. 1997) (internal citations omitted). The defendants' interpretation of the FDPA violates all three of these tenets.

Of course, there are circumstances, albeit few and far between, in which the apparent meaning of a statute must yield to other considerations. See Greebel v. FTP Software, Inc., 194 F.3d 185, 192 (1st Cir. 1999) ("Even seemingly straightforward text should be informed by the purpose and context of the statute."); see also N.H. Hemp Council, Inc. v. Marshall, 203 F.3d 1, 6 (1st Cir. 2000) (suggesting that there sometimes may be "sound reason for departure" from the apparent meaning of statutory language). The defendants strive to persuade us that this is such an instance — that the substantial discretion enjoyed by district courts in managing cases must inform our reading of the statute. To this end, they cite our decision in Atlantic Pipe for the proposition that Congress must speak in "clear and unmistakable" terms in order to "cabin the district courts' inherent powers." 304 F.3d at 142.

-18-

The defendants misread <u>Atlantic Pipe</u>, which squarely holds that a court's "inherent powers cannot be exercised in a manner that contradicts an applicable statute or rule." <u>Id.</u> at 143. This is just such a case: section 3593 limns a set of procedural rules applicable to federal capital cases. A brief glance at the other subsections, apart from subsection (b), makes this transparently clear. Subsection (a) mandates that the government "shall" provide pretrial notice of its intent to seek the death penalty and specify the aggravating factors that it intends to prove in support of that penalty. 18 U.S.C. § 3593(a). Subsection (c) delineates the procedures for how the parties must go about proving aggravating or mitigating factors. <u>Id.</u> § 3593(c). Subsection (d) sets forth a requirement for "special findings" identifying which aggravating and mitigating factors were proven. <u>Id.</u> § 3593(d). Subsection (e) memorializes the requirement that the factfinder "shall consider" whether the aggravating factors outweigh the mitigating factors in the case, and then (if a jury, by unanimous vote) "shall recommend" the penalty. <u>Id.</u> § 3593(e). Subsection (f) directs that the court "shall instruct the jury" that it cannot consider the race, color, religious belief, national origin, or gender of the defendant or the victim in deciding whether to apply the death penalty. <u>Id.</u> § 3593(f).

These provisions are of a piece with subsection (b) which, as previously described, specifies that the jury that

-19-

determined guilt "shall" hear the penalty phase unless one of four narrow exceptions applies. All of these provisions employ mandatory language directing that particular rules of procedure "shall" be followed. This refutes any notion that Congress intended the district courts to retain discretion to disregard any or all of the prescribed rules. See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 35 (1998) (explaining that statutory procedural rules couched "in terms of the mandatory 'shall' . . . normally create[] an obligation impervious to judicial discretion").

The bottom line is this: where Congress has provided a specific panoply of rules that must be followed, the district court's discretionary powers simply do not come into play. Because this is such an instance, there is no reason to distort the plain meaning of the statutory text in an effort to preserve those powers. We hold, therefore, that the language of the exception in section 3593(b)(2)(C), ("the jury that determined the defendant's guilt was discharged for good cause . . . ") refers exclusively to a jury that has returned a guilty verdict in a federal capital case. Accord Williams, 400 F.3d at 282 (holding that the "'good cause' language pertains to discharging a jury that has already decided the defendant's guilt" and that "[t]he provision does not allow a pretrial option for a bifurcated jury").

In a further effort to justify its order, the court below made an alternate holding:  that "to the extent that § 3593 can be read to require a unitary jury, defendants [may] waive that requirement."  Green II, 343 F. Supp. 2d at 25.  We reject that holding as well.

Section 3593 sets forth a set of general rules that govern all parties and the court itself.  In those instances in which the statute does create rights that accrue to only one side or the other, the statute is explicit.  For example, section 3593(c) specifies that the government "shall open the argument" and the defendant "shall [then] be permitted to reply."  So too section 3593(b)(3), which makes specific reference to the ability of the parties jointly to waive certain of the rules (e.g., the right to a sentencing jury).  The statute does not offer any such option with respect to the unitary jury rule of subsection (b)(1).  The intentional inclusion of a waiver mechanism in one part of the statute persuasively indicates that the exclusion of such a waiver provision in another part of the same statute was intentional. See Duncan v. Walker, 533 U.S. 167, 173 (2001) (describing as "well-settled" the proposition that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (citation and internal quotation marks omitted));

-21-

_Frazier_ v. _Fairhaven Sch. Comm._, 276 F.3d 52, 68 (1st Cir. 2002) (explaining that "in harmony with the maxim _inclusio_ _unius_ _est_ _exclusio_ _alterius_, the explicit provision of remedies within a statute cuts sharply against the implication of [others]"). A federal capital defendant can no more waive the default rule of a unitary jury than the government can waive the rule that requires the court to instruct the jury to disregard the defendant's race.

If more were needed — and we doubt that it is — we would find it surpassingly difficult to believe that a statute that requires government approval of the defendant's motion to dispense with a sentencing jury would sub silentio permit a defendant to obtain _two_ juries as of right. With respect to the deployment of a unitary jury in a federal capital case, "Congress intended to give no options, only commands." _Williams_, 400 F.3d at 282. As such, the district court's order cannot be sustained on the basis of its alternate holding.

Our odyssey is not yet completed. The government invites us to pass upon the validity of the district court's suggestion that it might defer death-qualification altogether until after it takes a verdict on the issue of guilt or innocence. _See_ _Green I_, 324 F. Supp. 2d at 331. We decline the invitation. Despite the nomenclature, advisory mandamus does not permit federal courts to issue advisory opinions. _See_ _Rhode Island_ v. _Narragansett Indian Tribe_, 19 F.3d 685, 705 (1st Cir. 1994) ("Article III of the

-22-

Constitution forbids courts from issuing advisory opinions or answering hypothetical questions."). The suggestion against which the government seeks protection is not embodied in an order and the defendants have thus far decried the concept. See Green II, 343 F. Supp. 2d at 25. Consequently, there is no live controversy as to that suggestion.

## III.  CONCLUSION

Section 3593(b)(2) requires that, in a federal capital case, the jury that determines guilt also must determine the penalty unless one of four exceptions pertains. The exception relied upon by the lower court — "discharge[] for good cause," 18 U.S.C. § 3593(b)(2)(C) — requires that there be a dismissal of the jury for good cause after it has returned a verdict in the guilt phase of the trial. The district court's order is incompatible with our reading of this statute.

We are not unmindful that the FDPA, as written, may complicate the trial of mixed capital and non-capital charges. But our task is to attempt, as best we can, to follow Congress's prescription, not to endeavor to improve upon it. The Supreme Court has made it pellucid that a death-qualified jury constitutionally may hear and determine non-capital charges, at least where there are "significant interests" in trying a non-capital defendant jointly with a defendant who is facing a capital charge. See Buchanan, 483 U.S. at 420. At the same time, this

-23-

language cannot be read to provide the government with an absolute entitlement to joint capital/non-capital trials whenever it pleases. Thus, we are confident that the district court, armed with the discretion to sever charges and defendants, will be able to ensure fundamental fairness in the trial of such mixed cases.

We need go no further. Inasmuch as the central issue presented in this case is novel, of great importance, likely to recur, and otherwise apt to evade review, we grant the government's petition for a writ of mandamus, vacate the dual jury order, and remand the case for further proceedings consistent with this opinion.

**So Ordered**.