**UNITED STATES of America,**

v.

**Donnell YOUNG.**

No. 3:98–00038.

United States District Court,
M.D. Tennessee,
Nashville Division.

April 22, 2005.

---

Richard Kammen, Gilroy, Kammen & Hill, Indianapolis, IN, Thomas F. Bloom, Nashville, TN, for Donnell Young.

### MEMORANDUM ORDER

JOHN T. NIXON, Senior District Judge.

Pending before the Court is Defendant's Motion for Bifurcated Juries (Doc. No. 1783), filed with an accompanying memorandum (Doc. No. 1784), to which the government has responded (Doc. Nos.1819, 1837, 1846). A hearing was held on this motion on January 18, 2005. For the reasons herein, Defendant's motion is GRANTED.

### Background

This case involves an array of alleged criminal activity in which charges have been filed against over twenty-five defendants. The most recent indictment filed by the government, the Fifth Superseding Indictment ("the Indictment"), is seventy-five pages long and contains forty-five counts. (Doc. No. 1437). The charges arise out of an alleged expansive continuing criminal enterprise and drug conspiracy that the government denominates the "Shakir Enterprise." The "Shakir Enterprise," a faction of the Los Angeles-based street gang, the "Rollin' 90s Crips," allegedly transported and distributed controlled substances; used and possessed firearms; laundered money; and engaged in violent acts including assault, abduction, robbery, and murder. The charges span a seven-year period from 1993 to September 1999 and allege wrongdoing in various communities, including Los Angeles, California, Oklahoma City, Oklahoma, Memphis, Tennessee, and Nashville, Tennessee.

This Court granted a motion for severance and set a trial date for Defendant Donnell Young ("Defendant" or "Young") and two co-defendants, Derrick Eatmon and Eben Payne. The Court recently found that co-defendant Eben Payne is presently suffering from a mental disease or defect rendering him mentally incompetent and committed him to the custody of the Attorney General. Trial will proceed against Defendant Young and non-capital defendant Derrick Eatmon on June 20, 2005.

In United States' Notice of Intent to Seek a Sentence of Death Against Defendant Donnell Young (Doc. No. 1461) ("NOI"), the government notified the Court and Defendant that the government will seek a sentence of death for Young in the event of his conviction on any of the following counts in the Indictment related to the death of Woody Pilcher in Oklahoma: (1) count thirty-seven, charging the killing of Woody Pilcher in furtherance of a continuing criminal enterprise and a conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2; (2) count thirty-eight, charging the killing of Woody Pilcher to

obstruct justice, in violation of 18 U.S.C. §§ 2, 1512(a)(1); and (3) count thirty-nine, charging causing the death of Woody Pilcher by the use and carrying of a firearm during and in relation to a crime of violence or drug trafficking crime, in violation of 18 U.S.C. §§ 2, 924(c)(1), 924(j).

In the present motion, Defendant moves the Court for an order empaneling two successive juries during the trial of this cause of action. Defendant requests that the parties first select a guilt/innocence jury without the process of "death-qualification" and then, in the event the Defendant is convicted of a capital eligible offense, the parties would select a second death-qualified jury for the sentencing phase. The government opposes this motion in its entirety. For the reasons stated below, the Court finds good cause to grant Defendant's motion.

### Legal Standards

■ Bifurcated proceedings are required in all death penalty prosecutions in order to avoid constitutional deficiencies. *Gregg v. Georgia*, 428 U.S. 153, 190–95, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The first proceeding resolves whether the defendant is guilty and the second proceeding, if necessary, decides the punishment.

■ The Supreme Court has held that "a State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict or death .... [and] a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 520, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). However, there is no question that the government is entitled to "death-qualify" the jury that decides the Defendant's punishment. *Id.; Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The juror whose views on the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath," *Wainwright*, 469 U.S. at 424, 105 S.Ct. 844, cannot be permitted to serve on the jury. Jurors whose opposition to the death penalty would prevent impartiality at the guilt/innocence phase, prevent consideration of the death penalty as a sentencing option, or make them automatically vote to impose death if the defendant is found guilty cannot be permitted to serve. *See id.*

■ However, while two hearings are constitutionally mandated, there is no corollary requirement for the same jury to sit for both hearings. In *Lockhart v. McCree*, 476 U.S. 162, 174–77, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court held that having death-qualified jurors sitting in the guilt/innocence phase does not violate the Sixth Amendment's fair cross-section or impartial jury requirements. However the Court did not set forth a requirement that death-qualified jurors *must* sit through the guilt/ innocence phase. The Supreme Court has in fact suggested that a dual jury procedure may help fairly accommodate both the defendant's and the government's interests in death penalty cases. *See Witherspoon*, 391 U.S. at 520 n. 18, 88 S.Ct. 1770 (suggesting the "possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment"); *see also United States v. Green*, 343 F.Supp.2d 23, 30–32 (D.Mass.2004) (citing same).

The sentencing procedures for this case are contained in the Federal Death Penalty Act of 1994, 18 U.S.C. § 3593(b) ("FDPA"), which provides in pertinent part:

(b) Hearing before a court or jury. If ... the defendant is found guilty of or

pleads guilty to an offense ... the judge ... shall conduct a separate sentencing hearing to determine the punishment to be imposed. The hearing shall be conducted—

(1) before the jury that determined the defendant's guilt;

(2) before a jury empaneled for the purpose of the hearing if—

(A) the defendant was convicted upon a plea of guilty;

(B) the defendant was convicted after a trial before the court sitting without a jury;

(C) the jury that determined the defendant's guilt was discharged for good cause; or

(D) after initial imposition of a sentence under this section, reconsideration of the sentence under this section is necessary; or

(3) before the court alone, upon the motion of the defendant and with the approval of the attorney

18 U.S.C. § 3593(b).

This provision of the FDPA does not specify at what point in a criminal proceeding the Court must determine that there is good cause. The federal courts are split as to whether a court can decide in advance of trial to discharge the guilt/innocence jury for "good cause" under § 3593(b)(2)(C). *See United States v. Green*, 343 F.Supp.2d 23, 30–32 (D.Mass. 2004) (creating a dual jury procedure under the FDPA and empaneling a non-death-qualified jury to for the guilt/inno-

cence phase); *contra United States v. Williams*, 400 F.3d 277, 2005 WL 348153, at * 3 (5th Cir.2005) (overruling an order from the Southern District of Texas that empaneled two juries because, inter alia, "[t]he 'good cause' language pertains to discharging a jury that has *already decided* the defendant's guilt"); *United States v. O'Driscoll*, 250 F.Supp.2d. 429, 430–31 (M.D.Pa.2001) ("Section 3593(b)(2)(C) does not permit us at the beginning of the case to make a decision to empanel two juries.").

## Discussion

In his motion and memorandum of law, Young argues that a single death-qualified jury will prejudice the guilt/innocence phase of the trial because: (1) death-qualified jurors are more likely to make their sentencing decision prematurely, before the penalty phase of the trial; (2) death-qualified jurors are disproportionately biased toward imposing a sentence of death; (3) the outcome of the case would be greatly dependent upon the overall racial composition of the individuals jurors; and (4) the jury would not represent a fair cross-section of the community and reflect the conscience of the community because the death-qualification process would result in a virtually all white jury. Young argues that failure to grant this motion will violate his Fifth, Sixth, and Eighth Amendment rights. Defendant also relies on *United States v. Green*, 343 F.Supp.2d 23 (D.Mass. 2004), where the court empaneled two juries at the outset of a trial under provisions of the FDPA.[1]

1. The court's order empaneled two juries, if necessary, based on the following findings: (1) FDPA § 3593 does not require two hearings before a single jury; (2) to the extent § 3593 does not require a unitary jury, the defendants waived that requirement; (3) multiple liability proceedings were already required because of the cases' scope and complexity; (4) it was premature to conclude that there was a need for a punishment phase at

all, based on the defendant's evidence; (5) the death qualification of the punishment-jury would add substantially to the time it takes for the other trials scheduled in the instant prosecution; (6) there were ways to accommodate the government's interests in avoiding the multiple testimonies of witnesses and victims; (7) there was a "unique complexity of death qualifying a jury in Massachusetts, and the court recognized studies that demonstrate

The government opposes Defendant's motion and argues that § 3593(b)(2)(C) of the FDPA gives the Court discretion to impanel a distinct punishment-phase jury only once the original jury has rendered a guilty verdict. The government further contends that: (1) a dual jury procedure would be too time-consuming because it would essentially require two different trials; (2) all of the witnesses would be burdened by having to testify twice; (3) even if there were two separate juries, the government would be entitled to ask questions about the death penalty in the first guilt/innocence phase voir dire; and (4) a dual procedure may actually work to Young's detriment because, at the sentencing phase, he would not benefit from any "residual doubts" as to guilt from the liability phase.

■ As a preliminary matter, this Court sides with the reasoned analysis of the District of Massachusetts and finds that § 3593(b)(2)(C) of the FDPA gives the Court discretion to empanel two juries for good cause before the trial. To the extent that the FDPA only allows the Court to invoke the dual jury procedure after a guilty verdict has been rendered, Young has waived this requirement. *See Green,* 343 F.Supp.2d at 30–31 (finding that "by objecting to death-qualifying the guilt jury, defendants are waiving the provisions of § 3593 that arguably oblige the Court to hold guilt and punishment trials before the same jury" and reasoning that "if the right to appeal from a sentence can be waived along with a long list of other rights, surely § 3593 rights can be waived.").

As this Court finds that good cause exists at this time, for the reasons below, the Court invokes § 3593(b)(2)(C)'s dual jury procedure. The Court will address each of the arguments made by Young and the government below in setting forth the reasons why good cause exists in this case.

## A. Case Management

■ The Court first finds that good cause exists to empanel both a guilt/innocence jury and, if necessary, a sentencing jury because it will be much more efficient method to manage the multiple cases arising from the Indictment and cases related to this investigation. This Court will likely need to draw on a jury pool of several hundred jurors in order to empanel a jury that is both death-qualified and that will be able to serve for several months. Each of these jurors will need to fill out a questionnaire for the Court's review. Many potential jurors will then go through a lengthy voir dire process. There is no question that selecting a jury for the guilt/innocence phase will be less time-consuming in a dual jury setting because guilt/innocence jurors will not need to be death-qualified. If a guilty verdict is not reached, then a second lengthy selection process to empanel a death-qualified jury will not be necessary.

Even if a guilty verdict is reached by the first jury, different evidence and information will be relevant to the guilt/innocence and sentencing phases. As the Supreme Court stated in discussing bifurcated proceedings in death penalty cases, "much of the information that is relevant to the sentencing decision may have no relevance to

that death qualification leads to the exclusion of a disproportionate number of black and/or female jurors and studies that suggest that death-qualified juries are more conviction prone"; and (8) while the prosecution has a right to a death sentencing jury, it does not have a right to a death-qualified liability jury. *See generally id.* In a supplemental memo-

randum, the Massachusetts federal court emphasized that there were different facts that would be presented in the guilt/innocence phase and sentencing phase, such that there would not be a complete repetition of information were two juries ultimately required. *See United States v. Green,* 348 F.Supp.2d 1 (D.Mass.2004) (supplemental memorandum).

the question of guilt, or may even be extremely prejudicial to a fair determination of that question." *Gregg v. Georgia* 428 U.S. 153, 190, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Certainly, during the guilt/innocence phase, the evidence will relate to whether Young committed the crimes alleged under the Indictment. At the sentencing phase, information may be presented "as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered" unless its probative value is "outweighed by the danger of unfair prejudice, confusion of the issues, of misleading the jury." 18 U.S.C. § 3593. Evidence related to the threshold intent factors, statutory and non-statutory aggravating factors, and mitigating factors are the proper province for the penalty phase. Victim impact statements or testimony can also be presented during the penalty phase hearing.

The government has indicated that it will proffer evidence pertaining to the following statutory aggravating factors: (1) heinous, cruel, or depraved manner of committing offense under § 3592(c)(6); (2) pecuniary gain under § 3592(c)(8); and (3) substantial planning and premeditation under § 3592(c)(9). The government has also indicated that it will proffer evidence pertaining to the following non-statutory aggravating factors identified under § 3593(a) and as pled by the government in the NOI: (1) defendant has participated in, directed, approved, or solicited other acts of violence; and (2) impact on victim's family; (3) the defendant's continuing danger to others; (4) defendant's low potential for rehabilitation; and (5) that the defendant was on bond with other criminal

charges when he committed the alleged offenses. Comparing these factors to the charges in the Indictment, the Court finds that there is a substantial difference in the evidence that will likely be submitted during the guilt/innocence phase and sentencing phase. As there is a substantial difference, if there is not ultimately a penalty phase, the Court and parties will have saved an extraordinary amount of time and resources by not having death-qualified the first jury.[2]

Time and resource management are especially important considering the issues confronting this Court arising from the fact that the government's case has been pending in this Court for over *seven years*. In addition to Young, four defendants, including two capital defendants, are still awaiting trial. As such, this case, and other related cases, will still not be resolved for years. This is particularly a concern for the Court when considering the unique situation of many of the other co-defendants who have already pleaded guilty to the government's charges as they relate to the "Shakir Enterprise" and are awaiting sentencing and placement in Bureau of Prisons facilities. These defendants will not be sentenced until after they have testified at the trials of the remaining defendants in order to benefit from downward departures for substantial assistance to the government.

The Court is concerned that some of these defendants are closely approaching their maximum sentences. Moreover, the Court has recently been inundated with motions from some of these co-defendants seeking placement in Bureau of Prisons facilities. After the government declined

---

2. If a dual jury procedure were to be utilized for each death-eligible defendant in this case, and even if one defendant is found not guilty, substantial time and resources would be saved. Moreover, if more federal courts adopted this approach where good cause existed, then death penalty litigation could become more efficient for the federal courts in the aggregate.

their requests to include downward departures in their plea agreements before providing assistance during the trials of the remaining defendants, all but one of these co-defendants withdrew their motions. The Court anticipates that these types of motions and other issues related to such extensive pretrial confinement will continue to occupy the Court's and the parties' time and resources. The Court is concerned that many of these co-defendants are currently located at facilities that do not offer programs such as vocational or educational training, and have been so located for approximately seven years.[3] This fact surely constrains these defendants' ability to successfully reintegrate into society after their release.

Substantial time and resources may be saved by adopting this approach considering the extraordinary conflict between the defendant and the government over the aggravating factors in the NOI. Since the government filed the NOI in this case, Defendant has made many attempts to obtain further evidence and information relating to both the statutory and non-statutory aggravating factors listed in the NOI. The Court has ordered the government to submit a bill of particulars and an evidentiary outline on some of the factors, struck certain of the non-statutory aggravating factors, and reserved ruling on whether to strike others until possibly after the guilt/innocence phase. Defendant is concerned about potential bias resulting from inferences during voir dire regarding the specific aggravating factors upon which the Court has yet to rule. While an evidentiary hearing is currently scheduled on this matter, the government has filed a motion for reconsideration, arguing, *inter alia,* that a hearing would provide Young with an unfair preview of the. evidence.

By bifurcating the jury, and thus postponing the evidentiary hearing, both the government's and Defendant's immediate concerns will be alleviated. Any outstanding concerns regarding the aggravating factors can be addressed after the guilt/innocence phase, if necessary. This will also considerably expedite the guilt/innocence phase.

The government argues that witnesses will be burdened by having to testify more than once. The Court first notes that many of the government's witnesses are testifying in order to benefit themselves in terms of a downward departure, so their burden is not terribly heavy. Moreover, as this is a multi-defendant Indictment, with at least four defendants still awaiting trial, the possibility that witnesses will have to testify more than once, over the course of several trials, is a burden that is difficult for the Court to alleviate whether or not there are two juries with respect to this particular defendant.

In order to address the government's concern, however, the Court will take steps to reduce such duplication and encourage the parties to do the same. One way to reduce duplicative evidence is for the government to condense evidence supporting guilt or innocence at the penalty-phase hearing, if the need for such a hearing arises. The parties may also make stipulations as to evidence. For example, the Defendant stated in the hearing that he would make stipulations at the penalty phase with respect to evidence offered by the police and pathologists. The Court can allow portions of the trial transcript and exhibits to be offered in lieu of testimony. While there may be some duplication of evidence, nothing like a complete repetition of evidence would be necessary were two juries ultimately required.

---

**3.** As the Magistrate Judge in this case noted in a recent Order, "This is an extremely unusual case. The Magistrate Judge does not recall another case where there has been so much time served in presentence confinement." (Doc. No. 1825 at 5).

The government also argues that even there are two juries, the government could ask the prospective jurors during the guilt/innocence phase voir dire questions about the death penalty. The government has not suggested that it would be able to exclude jurors for cause based on answers to any questions regarding the death penalty. In argument, Defendant contended that the government should not be permitted to ask questions regarding the death penalty in the guilt/innocence phase voir dire. Closer to the trial date, the Court will create a jury questionnaire and address what questions are allowable at voir dire. At this time, and for purposes of this Order, the government's argument does nothing to change the Court's position regarding the efficiency of a unitary jury procedure. Assuming arguendo the government asked some questions regarding the death penalty, this would not take as much time as would be spent were the government to ask questions to determine its right to exclude under *Witherspoon.*

As the government's concerns can be alleviated in other ways, and because a dual jury procedure may ultimately save this Court and the parties substantial time and resources, and lead to speedier sentencing of the many co-defendants who have already pleaded to their charges, the Court finds good cause to invoke the dual jury procedure of FDPA § 3593(b).

**B. Racially Diverse Jury**

■ The Defendant also argues that three problems revealed by social science evidence will have a contaminating effect on the guilt/innocence phase in this case: premature decision-making by the jury, the overall biasing effect of the jury selection process, and the influence of race on juror decision-making. With respect to the race issue, the Court is particularly concerned about the overwhelming evidence indicating that Blacks are dispropor-tionately opposed to the death penalty and therefore under-represented on death penalty juries because of the effect of *Witherspoon.* Young argues that it is particularly important that he has the opportunity to have Black jurors during the guilt/innocence phase because he is a Black male from Los Angeles, California "and has no connection whatsoever to Nashville, Tennessee." The Defendant is still conducting research into the demographics of the master jury wheel and juries in the Middle District of Tennessee.

The Court is highly persuaded by the academic literature and social science evidence on this point. Studies indicate that race and sex are the "two major demographic predictors of death penalty attitudes." Samuel R. Gross, *Update: American Public Opinion on the Death Penalty—It's Getting Personal,* 83 Corn. L.Rev. 1448, 1451 (1998). In a 1996 study, for example, Blacks favored the death penalty at a rate of 51%, compared to Whites who favored the death penalty at a rate of 75%. *Id. (citing* Ellsworth & Gross, *Hardening of the Attitudes: Americans' Views on the Death Penalty,* 50 J. Soc. Issues 19, 21 (1994)); *see also United States v. Green,* 343 F.Supp.2d 23, 34 n. 17 (D.Mass.2004) (citing cases and statistics on juror attitudes in which Whites were more likely than Blacks to favor the death penalty); Eisenberg, Garvey & Wells, *Forecasting Life and Death: Juror Race, Religion, and Attitude Toward the Death Penalty,* 30 J. Legal Stud. 277, 279 (2001) (noting that Whites support the death penalty more than Blacks and finding that on death penalty juries, "Black jurors are substantially more likely to vote for life on the first ballot"). As far back as *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137, (1986), the disparate racial effect of the death-qualification process has been recognized. *See McCree,* 476 U.S. at 187, 106 S.Ct. 1758 (1986) (Mar-

shall, J., dissenting) ("Among the members of the [*Witherspoon*] excludable class are a disproportionate number of blacks and women.")

The lack of racial diversity in the local jury pool confounds this concern. The Court's preliminary research indicates that Blacks are indeed under represented in the jury pool for the Nashville Division of the Middle District of Tennessee. Approximately 7.78% of individuals in the master jury wheel are Black.[4] According to the United States Census Bureau statistics, 25.9% of Davidson County, where Nashville is located, is Black. However, the master jury wheel is derived from the entire Nashville Division of the Middle District of Tennessee and comprises the less densely populated counties of Cannon, Cheatham, Davidson, Dickson, Houston, Humphreys, Montgomery, Robertson, Rutherford, Stewart, Sumner, Trousdale, Williamson, and Wilson. *See* 28 U.S.C. § 123. Approximately 15.4% of the Nashville Division of the Middle District of Tennessee is Black.[5] This is slightly higher than the national average, in which Blacks comprise 13% of the total population of the

United States.[6] Based on these statistics, the percentage of Blacks in the Middle District's jury pool is only approximately 50% or half of the percentage of Blacks in the general population of the Middle District, and only approximately 60% of the national Black population.

The Court finds that it is highly likely that in this case Black jurors will be disproportionately excluded for cause due to the high rate of Black opposition to the death penalty. The effect on the jury is likely to be exacerbated by the small percentage of Blacks in the jury pool for the Middle District of Tennessee. This is a matter of great concern for the Court and provides further good cause to empanel two juries, one which will not need to be death-qualified. Not only will a racially diverse jury will be more ideologically diverse with respect to views on the death penalty, the Court agrees with the Defendant and finds that having a racially diverse jury is particularly important where the Defendant is Black and is not being prosecuted in his home community of Los Angeles, California.[7] Adopting this measure to insure that Young will have Blacks

---

4. This information was obtained from records from the U.S. District Court for the Middle District of Tennessee dating April 2002–April 2005 and is under seal. (Doc. No.1909). The statistics are based on self-reporting of race in initial jury questionnaires sent to individuals summoned from the master jury wheel. The master jury wheel is derived from voter registration and drivers license records. Approximately one-third of those individuals summoned do not self-report their race. Also, many individuals in this initial group may ultimately be exempt from jury service and close to one-third do not return their questionnaires.

5. According to U.S. Census Bureau statistics, the percentages of Blacks in those counties are as follows: Cannon 1.5%; Cheatham 1.5%; Dickson 4.6%; Houston 3.3%; Humphries 2.9%; Montgomery 19.2%; Robertson 8.6%; Rutherford 9.5%; Stewart 1.3%; Sum-

ner 5.8%; Trousdale 11.4%; Williamson 5.2%; Wilson 6.3%. *See* **http://cber.bus.utk.edu/census/2k/stf1 /sf1c189.pdf** (listing by county) (last visited April 18, 2005).

6. 2002 U.S. Census. *See* **http://www.census.gov/prod/2003pubs/p20–541.pdf** (last visited April 18, 2005). This figure was 12.3% in the 2000 census. *See* **http://quickfacts.census.gov/ qfd/states/00000.html** (last visited April 18, 2005).

7. *See* Laura G. Dooley, *The Dilution Effect: Federalization, Fair Cross–Sections, and the Concept of Community*, 54 DePaul L.Rev. 79 (2004) (arguing that the " 'federalization' of so-called street crime, notably murders and robberies, has the effect in most states of widening the 'community' from which jurors will be drawn from a county within a state to a federal district or division encompassing

represented on the jury that determines his guilt or innocence is further justified by equitable considerations of justice, fairness, and promoting public confidence in the federal criminal justice system.

### C. Premature Decision–Making and Biasing Effect

■ Defendant points to additional social science evidence to support his claims regarding jurors' propensity for premature decision-making and the overall biasing effect of the jury selection process.[8] Defendant asserts that 49.2% of all death-qualified capital jurors make their sentencing decision before the penalty phase. (Doc. No. 1793) (*citing* Bowers & Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness From Capital Sentencing*, 39 Crim. Law. Bulletin 51, 56 (2003)). The Court is troubled by this data considering that before the penalty phase, the jury has not had the opportunity to hear evidence pertaining to, for example, aggravating or mitigating factors, or jury instructions pertaining to sentencing. This evidence suggests that the jurors may not fairly weigh Young's guilt or innocence.

Defendant also sets forth arguments and social science evidence that show that the death-qualification process produces jurors who believe that the death penalty is the only appropriate punishment for certain types of murders and that many jurors believe that the subtext of voir dire is that the trial is about the punishment, not whether the defendant committed the crime. (*Id.*) (*citing* Bowers & Foglia at 62). Moreover, the evidence shows that one's opinion of the death penalty is correlated with other views that are antithetical to American due process values and procedures.[9] The data demonstrates that

---

several counties" and that a "troubling second-order effect of this practice ... is to delocalize juries, often diluting any significant minority representation.")

8. The Defendants cites several studies to support these propositions. Acker, Bohm, & Lanier, *America's Experiment With Capital Punishment* (2d ed.2003); Bowers & Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness From Capital Sentencing*, 39 Crim. Law. Bulletin 51 (2003); Bowers, Steiner & Sandys, *Death Sentencing in Black and White: An Empirical Analysis of the Role of Jurors' Race and Jury Racial Composition*, U. Pa. J. Const. L. 171 (2001); Cowan, Thompson & Ellsworth, *The Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation*, 8 Law & Hum. Beh. 53 (1984); Fitzgerald & Ellsworth, *Due Process v. Crime Control: Death Qualification and Jury Attitudes*, 8 Law & Hum. Beh. 31 (1984); Craig Haney, *Examining Death Qualification: Further Analysis of the Process Effect*, 8 Law & Hum. Beh. 133 (1984); Craig Haney, *On the Selection of Capital Juries: The Biasing Effects of the Death–Qualification Process*, 8 Law & Hum. Beh. 121 (1984); Haney, Hurtado, & Vega, "*Modern*" *Death Qualification: New Data on Its Biasing Effects*, 18 Law & Hum. Beh. 619 (1994).

Young also references the work of the Capital Jury Project ("CJP"), a program of research on the decision-making of capital jurors started in 1991 by a grant from the National Science Foundation. *See* http://www.cjp.neu.edu (last visited Apr. 6, 2005) (listing dozens of publications based on CJP research). Several courts have cited CJP research. *See, e.g., Strickler v. Greene*, 527 U.S. 263, 305, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (Souter, J., concurring in part and dissenting in part) ("common experience, supported by at least one empirical study, *see* Bowers, Sandys, & Steiner, *Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Guilt–Trial Experience, and Premature Decision Making*, 83 Corn. L.Rev. 1476, 1486–1496 (1998), tells us that the evidence and arguments presented during the guilt phase of a capital trial will often have a significant effect on the jurors' choice of sentence")

9. In a recent case, Judge DeMoss of the Fifth Circuit Court of Appeals found that:

the need to death qualify the jury in this case resulted in a panel that was clearly prosecution oriented and that was much more likely to convict. Of the twelve jurors

death-qualified jurors may not believe in the presumption of innocence or that the failure of a defendant to testify on his or her own behalf is proof of guilt. (*Id.*) (*citing* Cowan, Thompson & Ellsworth, *The Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation*, 8 Law & Hum. Beh. 53 (1984); Fitzgerald & Ellsworth, *Due Process v. Crime Control: Death Qualification and Jury Attitudes*, 8 Law & Hum. Beh. 31 (1984)).

The Court is highly persuaded by this evidence, and it weighs as further good cause for bifurcating the jury for the guilt/innocence and sentencing phases. Faced with similar arguments and research, the *Green* court found, "[d]eath penalty qualification hinders my responsibility to facilitate, to the best of my ability, a fair trial on guilt." *United States v. Green*, 343 F.Supp.2d 23, 34 n. 17 (D.Mass. 2004). However, this Court is bound by the holding in *McCree* and bases its holding on its discretion under the FDPA. *See also id.* at 35 ("this decision does not rest on the conviction-prone juror problem and its constitutional implications.")

While this Court's holding rests on the its discretion to determine good cause under the statutory provision of the FDPA, and does not reach the constitutional question, the Court believes that post-*McCree* social science evidence calls into question *McCree's* holding that the fair cross-sec-

tion and impartial jury requirements under the Sixth Amendment are not violated by a unitary jury procedure. The significant amount of social science evidence gathered post-*McCree* that this Court has reviewed may well warrant a review of the constitutional issues in that case. While *McCree* appeared not to rest on the accuracy of social science evidence, as the Supreme Court "[assumed] for purposes of this opinion that the studies are both methodologically valid and adequate to establish that 'death qualification' in fact produces juries somewhat more 'conviction-prone' than 'non-death-qualified' juries," *McCree* 476 U.S. at 173, 106 S.Ct. 1758, the Court was highly skeptical of the evidence. The Court emphasized that the research before it relied on "individuals randomly selected from some segment of the population" and the Court had "serious doubts about the value of these studies in predicting the behavior of actual jurors." *Id.* at 171, 106 S.Ct. 1758. There has since been significant research done based on the experiences of actual jurors in capital cases, including much of the research conducted by the CJP referenced above.

## D. The Government's Prudential Reasons for a Unitary Jury are Unavailing

The Court has addressed the government's argument regarding the Court's discretion to impanel two juries at the

---

selected, ten described themselves in the jury questionnaire as "pro-death penalty." Eleven of the twelve jurors agreed that the "death penalty gives the criminal what he deserves," and disagreed that the death penalty was unfair to minorities. Ten of the twelve jurors stated that they disagreed or strongly disagreed with the statement that our system should err on the side of letting a few guilty people go free rather than on the side of convicting the innocent. All twelve jurors were comfortable with the use of undercover agents and informants

and ten of the twelve jurors had no objection to the use of government wire taps. Of the five jurors that gave responses, four indicated they would have no concern about government testimony induced by lenient treatment. . . . [I]t is clear to me that the jury selection process necessitated by [defendants'] capital status led to the empanelment of a strongly pro-government or conviction-prone jury. *United States v. Causey*, 185 F.3d 407, 431–32 (5th Cir.1999) (DeMoss, J., concurring in part and dissenting in part) (5th Cir.1999).

outset, concerns as to duplicative testimony of witnesses, and argument concerning questioning at voir dire. The last argument that needs to be addressed is whether, as the government suggests, a dual jury procedure may actually work to Young's detriment because, at the sentencing phase, he would not benefit from any "residual doubt" as to guilt from the liability phase.

Defendant disputes that residual doubt would be significant enough of a factor in this case to warrant a unitary jury proceeding. At oral argument, Defendant's counsel stated that there is no social science evidence to support the proposition that residual doubt would benefit the defendant and that the increasing number of cases where convictions are overturned on the basis of actual innocence indicates that, in any event, juries are often wrong in their determinations of guilt or innocence. Defendant's counsel also stated that it would be "malpractice" for him to rely on a residual doubt argument in defending Young.

The government has presented no evidence regarding the benefit of residual doubt. Common sense suggests that it might be a factor in a jury's sentencing decision in death penalty cases, and the Court has found some social science evidence to support this.[10] However, the Court has not found or been presented with any law or research that considers the effect of residual doubt in the jury's decision-making process with the effect of a bifurcated jury proceeding. With respect to volume, the Court has been presented with and has found significantly more research and discussion regarding bias in the death-qualification process than regarding the benefit of residual doubt. Second, the Court cannot help but to be wary of relying on the government's residual doubt argument as the government would not benefit from residual doubt arguments.[11] In fact, a dual jury procedure would actually advance the government's interest in avoiding the presentation of residual doubt arguments as mitigation evidence during the sentencing phase.

10. For an academic discussion of residual doubt, arguing that it should be accorded constitutional weight, see Margery Malkin Koosed, *Averting Mistaken Executions by Adopting the Model Penal Code's Exclusion of Death in the Presence of Lingering Doubt*, 21 N. Ill. U.L.Rev. 41 (2001). In an ongoing project of interviewing capital jurors after their service, jurors were presented with a list of fifteen possible mitigating factors, including residual doubt, and asked about their importance. *See* Bowers, Sandys & Steiner, *Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Guilt–Trial Experience, and Premature Decision Making*, 83 Corn. L.Rev. 1476 (1998). The researchers found that lingering doubt was a substantial factor and summarized their findings as follows: "By far, the strongest mitigating factor was lingering doubt, the one that read, 'Although the evidence was sufficient for a capital murder conviction, you had some lingering doubt that (the defendant) was the actual killer. Some 13.4% of the jurors indicated that this was a factor present in their case; of these, 62.9% said it was very important in their punishment decision, 69.2% said it made them "less" likely, and 48.7% said "much less" likely, to vote for death.' " *Id.* In conclusion, "of the 116 jurors who said that this was a factor in their case, 69.5% cast their final vote for life in comparison to 41.7% of the 756 jurors who said this was not a factor in their case." *Id.*

11. Faced with exactly this argument, Justice Marshall wrote, "[a]ny suggestion that the current system of death qualification 'may be in the defendant's best interests, seems specious unless the state is willing to grant the defendant the option to waive this paternalistic protection in exchange for better odds against conviction." *Lockhart v. McCree*, 476 U.S. 162, 205, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (Marshall, J., dissenting) (*citing* Finch & Ferraro, *The Empirical Challenge to Death–Qualified Juries: On Further Examination*, 65 Neb. L.Rev. 21, 69 (1986)).

Considered altogether, the residual doubt argument does not affect the Court's determination that there exists in this case good cause for a bifurcated jury. While the government may have an interest in a unitary jury proceeding, the Court finds that those interests are outweighed by the other factors discussed above that create good cause to bifurcate the jury.

## CONCLUSION

Even while finding the death penalty constitutional for certain crimes, the Supreme Court has been well aware that the punishment of death is "unique in its severity and irrevocability" and has been "particularly sensitive to insure that every safeguard is observed." *Gregg v. Georgia*, 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Finding that good cause exists at the outset to empanel one jury to decide Young's guilt or innocence and another, if necessary, to decide his sentence, and that a dual jury procedure will not unduly prejudice the government, Defendant's motion is GRANTED.

It is so ORDERED.